Edward J. Drew and Mary E. Drew v. Commissioner.
Drew v. Commissioner
Docket No. 7564-70.
United States Tax Court
T.C. Memo 1972-161; 1972 Tax Ct. Memo LEXIS 97; 31 T.C.M. (CCH) 799; T.C.M. (RIA) 72161; July 31, 1972
*97 1. Petitioner was a surgeon with a full-time practice. Beginning in 1965 he purchased show horses which members of his family would train and show. Petitioner did not participate in his family's horse activities and was not knowledgeable about show horses. The amount of prize money won by petitioner's horses was insubstantial during the years in issue in comparison to his losses from his horse operations. None of petitioner's horses were ever sold, and little effort was made to sell them. Held: Petitioner's losses from his horse operations were personal expenses whose deduction is barred by section 262. 2. Held, further: Petitioner failed to show that certain entertainment expenses were incurred in the course of his profession and that such expenses were deductible under section 162 and section 274. 3. Held, further: Petitioner failed to show that he was entitled to greater deductions for automobile expense under section 162 than had been allowed by respondent. Marion Hirschburg, for the petitioners. Leonard A. Hammes, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined deficiencies in the income taxes of petitioners of $4,271.78 and $8,325.88 for the years 1967 and 1968, respectively. The deficiencies stem from respondent's disallowance of deductions for losses incurred by petitioners in raising and training horses and for entertainment and automobile expenses. Findings of Fact Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. 800 Petitioners *99 are Edward J. Drew and Mary E. Drew, husband and wife, who at all relevant times resided in Des Moines, Iowa. During 1967 and 1968 Edward J. Drew practiced surgery in Des Moines, Iowa, and its environs, and Mary E. Drew taught school in Waukee, Iowa, as well as performing the duties of a housewife. The Drew family consisted of seven people: petitioners, three daughters, and two sons. Hereafter the term petitioner shall refer to Edward J. Drew. Petitioner's Horse Operations Prior to petitioner's purchase of his first horse in 1965, most of the members of his family had exhibited a keen interest in horses. Petitioner had spent many summers during his youth on a relative's farm where there were several horses. Petitioner's childhood experience made him fascinated by horses despite the fact that he suffered from asthma and allergies which acted up whenever he was near horses. A short exposure to horses or hay gave petitioner severe nasal and bronchial distress so that petitioner's appreciation of horses during the years in issue was always from a distance. Petitioner's wife had ridden horses when she was a child and had owned a horse shortly prior to her marriage to petitioner; *100 however, during the years in issue Mrs. Drew was unable to ride and had not ridden for over 25 years. After petitioner purchased his horses, Mrs. Drew would accompany her children to horse shows and would help them groom the horses. In 1967 petitioner's daughters Mary, Diane, and Janic were 22, 18 and 16 years old, respectively, and his sons David and Joseph were 16 and 14, respectively. All of these children except David had active interests in horses. Mary and Diane both learned to ride horses at school. Mary liked horses but did not become a proficient rider. After petitioner acquired his horses, Mary exercised them but did not show them at horse shows. Janice was the moving force behind petitioner's entry into equine enterprises. Janice learned to ride while at camp when she was ten or eleven years old. After both she and her brother Joe took riding lessons in 1964 or 1965, Janice urged her father to purchase a horse. Janice and Joe shouldered most of the responsibility for training and showing the horses that petitioner purchased. They would work with the horses after school hours, on weekends, and on vacations. Both Janice and Joe would travel with the horses to horse *101 shows. Even after she was married in 1971, Janice continued to devote a considerable amount of her free time to her father's horses. None of petitioner's children received any compensation for working with the horses or showing them. Upon Janice's suggestion petitioner purchased a horse for about $350 in 1965. This horse, which was entered in one horse show, died about a month after purchase. Petitioner's 1965 tax return did not reflect the loss of the horse as incurred in a business. At the time of purchasing the first horse petitioner had no concrete idea about entering the horse business. After the first horse died, petitioner consulted with his friend and medical colleague Dr. Nord, who had some expertise in the horse business. Dr. Nord suggested that petitioner purchase brood mares so that he could develop valuable colts. Petitioner decided to buy horses which were jumpers and hunters. Jumpers and hunters are not race horses, as racing destroys the marrow in the bones of the horses and makes them unfit for show purposes. The damage caused by racing is particularly severe if the horse is less than three years old. Hunters and jumpers are valued if they are superior performers *102 at horse shows. If a hunter and jumper is properly trained and displayed at good shows, it can appreciate in value considerably. Training for hunters and jumpers cannot begin before the horses are three years old because the horses' bones are weak until that age. To become a star or honor quality hunter and jumper a horse might require as many as five years of intensive training. Professional trainers of hunters and jumpers usually purchase horses after they are three years old in order to avoid the cost of boarding nonproductive horses during their early years; however, the horses are purchased before they are fully trained because trained horses are overly expensive. Professional trainers of hunters and jumpers make profits by improving horses which are not fully trained. 801 Professional trainers usually buy thoroughbred horses because these horses are better athletes. Prior to purchasing his horses petitioner had no knowledge or expertise in the filed of hunters and jumpers. Except for some conversations with friends and colleagues petitioner did not attempt to become knowledgeable about the field. Petitioner did not joint any horse owners' clubs or associations. At trial *103 petitioner could not recall the name of any horse owners' publication to which he subscribed during the years in issue. On October 31, 1965, petitioner purchased his second horse, Lyncheer, at a cost of $700. During the years in issue petitioner had an inventory of horses with an original cost of $19,900. The following schedule shows the horses acquired, the purchase price thereof, and any disposition made thereof: Date
Disposi-
On Hand
Name
Acquired
Age
Cost
tion
12-31-67
12-31-68
Lyncheer
10-31-65
9 months
$ 700.00
None
$ 700
$ 700
Apex
4-20-66
About 12 years
1,000.00
None
1,000
1,000
Silky
7-31-66
About 8 years
807.50
Traded on Nymrod
Nymrod
9-10-67
About 8 years
7,200.00
None
7,200
7,200
Davenport Jones
10-20-67
Unknown
7,500.00
Returned Defective
Family Affair
12- 2-67
5 years
11,000.00
None 11,000
11,000
Totals $19,900
$19,900 The cost (excluding depreciation), as shown on the tax returns filed for 1967 and 1968, for maintaining, training, and showing the horses owned by petitioners was the following: Cost
Name of Horse
1967
1968
Davenport Jones
$ 19.80
Apex
1,477.77
$1,031.90
Lyncheer
815.00
2,261.89
Nymrod
677.00
1,889.64
Silky
802.92
Family Affair 165.00
2,237.25
Total costs $3,957.49
$7,420.68
*104 During the years 1966 through 1970, petitioners claimed the following depreciation on their horses on their Federal income tax returns: Horse
1966
1967
1968
Lyncheer
$ 140.00
$ 140.00
$ 140.00
Apex
133.28
200.00
200.00
Silky
80.75
26.75
None
Nymrod
None
480.00
1,440.00
Family Affair None
183.33
2,200.00
Totals $ 354.03
$1,030.08
$3,980.00
Horse
1969
1970
Totals
Lyncheer
$ 140.00
$ 140.00
$ 700.00
Apex
200.00
200.00
933.28
Silky
None
None
107.50
Nymrod
1,440.00
1,440.00
4,800.00
Family Affair 2,200.00
2,200.00
6,783.33
Totals $3,980.00
$3,980.00
$13,324.11 Depreciation was claimed on all horses on the straight line method with a five-year life. No depreciation was claimed on horses in the year 1965. In the year 1967 the horses were kept at Hans Post Stables and Jonbar Stables, except for Apex which was out to pasture on a farm part of the year. The horses Lyncheer and Family Affair are mares. The horses Apex, Silky, Nymrod and Davenport Jones are geldings. Petitioner did not ever intend to breed the horses he purchased. All income, in *105 the years 1967 and 1968, produced by petitioners' horses consisted of awards or prizes won at horse shows as follows: Amount
Name of Horse
Name of Horse Show
1967
1968
Apex
Omaha Charity Horse Show
$19.50
Apex
Wayzata Country Club Horse Show
40.00
Silky
Charity Horse Show
25.00
Family Affair
Des Moines Charity
$110.00
Family Affair
Iowa State Fair
15.00
Totals $84.50
$125.00 802 Petitioners' horses appeared at the following horse shows in the year 1967: Name of Horse
Name of Show
Apex
Lyncheer
Nymrod
Silky
Kansas City - Mission Valley * * *
Stilwater * *
Wayzata Country Club * *
Omaha Charity Horse Show * *
Pony Club Show *
(Asterisk indicates horse appeared at particular show)
Petitioners' horses appeared at the following horse shows in the year 1968: Name of Horse
Name of Show
Apex
Lyncheer
Nymrod
Family Affair
Kansas City - Mission Valley * * * *
Minnesota State Fair * *
Iowa State Fair *
Roosevelt Show, Des Mones, Iowa * * * *
Des Moines Charity Show * * * *
Milwaukee Hunt Club * * *
Lake Forest, Ill * * * *
Oak Brook, Ill * * * *
Omaha Charity Horse Show * * *
(Asterisk indicates horse appeared at particular show)
*106 Of the horses that were at any time owned by petitioner, only Silky and Lyncheer were thoroughbreds. Petitioner owned Silky for about a year before trading him for nonthoroughbred Nymrod. Lyncheer was purchased by petitioner when she was nine months old and was untrained. Her high spirit was a drawback for hunter and jumper purposes. Despite the danger of ruining the horse by racing her when she was young, petitioner raced Lyncheer at Omaha and Lincoln, Nebr., for two years. Lyncheer won no money. Lyncheer was apparently the most successful of petitioner's investments in horses because she garnered a purchase offer of $6,000 in 1970; the rest of petitioner's horses did not fare so well. Petitioner paid $1,000 for the purchase of the horse Apex in the year 1966. Prior to the time petitioner purchased the horse, the horse at one time had sold for $17,000 and had more recently sold for $4,500. At the time petitioner purchased Apex it had a lame foot. Subsequently Apex developed infirmities and petitioner had to put the horse out to pasture. At the time of the trial Apex was not being shown as a hunter or jumper, and petitioner was not attempting to rehabilitate Apex. Although the *107 horse named Family Affair was a mare, the price of $11,000 petitioner paid for the horse was too high to use her for breeding purposes. Petitioner had hoped to sell his horse Family Affair for the price he had paid for her, but the horse was a disappointment and had not lived up to her expectations. The horse Nymrod which petitioner purchased in 1967 for the amount of $7,200 was a fairly well trained horse when he purchased it. Petitioner received an offer from a party in Kansas City to purchase his horse Nymrod for the amount of $7,000. The offer was received in the last couple of months prior to the trial in September 1971. Professionals who raise hunter and jumper horses usually have a turnover of their stock. Although contacts for the sale of horses are usually made at horse shows, petitioner had never sold a horse in five years of showing horses prior to trial. The only transaction made by petitioner during that time was the trade in of Silky on the purchase of Nymrod. By petitioner's own admission only two of his horses were salable. At the time that petitioner began purchasing horses and during the years in issue there was no significant market for hunter and jumper horses *108 in the Des Moines area. In order to sell his horses petitioner would have had to enter them in better shows as far away from the Des Moines area as the east or west coast of the United States. Without traveling to various parts of the 803 country and absent exceptional market conditions petitioner could not hope to recoup his investment and losses from his horses by selling them. At the time of trial petitioner did not intend to continue in the horse "business" if he were able to dispose of his horses. Petitioner could not train the horses himself, and his family was no longer available for the job. After several years of having his children train horses, petitioner was not basically knowledgeable in the field. Petitioner did not know the extent of the losses from his horse operation. Petitioner did not conduct business under any particular name, and he did not have a separate bank account for his horse operations. Petitioner did keep an account book showing each horse's winnings and expenses. During the years in issue petitioner's net income from his professional practice was in the neighborhood of $80,000. Petitioner indicated that he would be willing to absorb the substantial *109 losses from his horse operations as long as his professional income remained at its high level. Gift, Entertainment and Automobile Expenses Petitioners, in the year 1967, claimed deductions in the amount of $1,187.43 for business promotion and entertainment. Respondent allowed as a deduction $556.04 and disallowed $631.39. The following schedule shows the individual expenditures claimed as a deduction, the items allowed and those disallowed by respondent in the year 1967: Month
Individual Expenditures
Claimed
Allowed
Disallowed
Jan.
Bohemian Club
$ 15.00
$ 15.00
State University of Iowa
8.00
$ 8.00
Des Moines Club
31.00
31.00
Polk County Alumni SUI
3.00
3.00
3.00
3.00
Polk - D.M. Taxpayers Assoc.
5.00
5.00
Feb.
Des Moines Club
31.00
31.00
March
Des Moines Club
31.00
31.00
April
Bohemian Club
17.00
17.00
Des Moines Club
31.00
31.00
Millie's Drive-In
26.91
26.91
Millie's Drive-In
10.60
10.60
Med. Asst's (Dinner)
2.80
2.80
May
Bohemian Club
20.61
20.61
Des Moines Club
31.00
31.00
June
Des Moines Club
31.00
31.00
July
Bohemian Club
17.00
17.00
Des Moines Club
32.76
32.76
Aug.
Des Moines Club
31.00
31.00
Sept.
Millie's Drive-In
54.36
54.36
Polk County Med. Society
6.50
6.50
Oct.
Des Moines Club
61.59
61.59
Bohemian Club
17.00
17.00
Joseph's Jewelry
128.43
128.43
Metropolitan Club, D.M.
30.00
30.00
English Speaking Union
5.00
5.00
Nov.
Des Moines Club
31.00
31.00
Dec.
Univ. Iowa Alumni Assoc
8.00
8.00
Des Moines Club
31.00
31.00
Polk Co. Med. Soc.
329.00
329.00
Northwestern Candy Co. (Nurses and Intersn) 109.87
109.87
Totals $1,187.43
$556.34
$631.39
*110 Petitioners, in the year 1968, claimed deductions in the amount of $786.70 for business promotion and entertainment. Respondent allowed as a deduction $224.11 and disallowed $562.59. The following schedule shows the individual expenditures claimed as a deduction, the items allowed and those disallowed by respondent in the year 1968: 804 Month
Individual Expenditures
Claimed
Allowed
Disallowed
Jan.
Bohemian Club
$ 17.00
$ 17.00
"I" Club
10.00
$ 10.00
Des Moines Club
31.00
31.00
Feb.
Des Moines Club
31.00
31.00
March
Des Moines Club
31.00
31.00
Millie's Drive-In
7.15
7.15
Bohemian Club
27.80
27.80
April
Bohemian Club
17.00
17.00
Millie's Drive-In
14.05
14.05
Des Moines Club
31.00
31.00
May
Des Moines Club
31.00
31.00
June
Des Moines Club
31.00
31.00
July
Des Moines Club
31.00
31.00
Bohemian Club
17.00
17.00
Joseph's Jewelers
37.57
37.57
Aug.
Millie's Drive-In
10.43
10.43
Des Moines Club
31.00
31.00
Sept.
Nurses - N.W. Hospital
10.00
10.00
10.00
10.00
Bohemian Club
11.95
11.95
Des Moines Club
31.00
31.00
Oct.
Bohemian Club
17.00
17.00
Metropolitan Club, D. M.
13.00
13.00
Des Moines Club
83.44
83.44
Nov.
Dr. Goldberg
25.00
25.00
Des Moines Clbub
31.00
31.00
Millie's Drive-In
9.35
9.35
AMA Dinner - Lu Conner
2.50
2.50
.03
.03
Dec.
Bohemian Club
10.80
10.80
Northwest Candy Co. 135.63
135.63
Totals $786.70
$224.11
$562.59
*111 The Des Moines Club operates a five-story building where there are several different dining rooms and several different bars. The Des Moines Club also has a barber shop, massage parlor, poolroom and billiard room. Petitioner occasionally ate his own meal at the Des Moines Club. The Bohemian Club is located in the Savery Hotel at Des Moines, Iowa. It operates a bar and dining room in the hotel. Petitioner occasionally ate his own meal at the Bohemian Club. The Metropolitan Club was a club started in Des Moines which held a meeting every month where speakers of national reputation were brought in to speak. Petitioner ate a meal at the meetings of the Metroplitan Club which he attended. Petitioner would deduct the cost of his own dinner when he had a meal with another doctor at a club, if he thought the specific purpose was business. The amounts of $128.43 and $37.57 paid to Joseph's Jewelers in October 1967 and July 1968, respectively, represented the cost of wedding presents for the daughters of doctor colleagues of petitioner. Petitioner claimed that these doctors had referred thousands of dollars of business to him over a number of years but also admitted that these doctors *112 were also social friends of his and that he often sent wedding presents when he was invited to a wedding. During 1967 petitioner had expenses relating to the operation of his automobiles in the amount of $2,831.87 of which he claimed deduction of $2,832.41 on his return for that year. At trial petitioner conceded that $809.94 of amounts paid to oil companies were not deductible leaving the following items totaling $1,670.90 at issue: Hellyon Service Station
$ 3.28
Standard Oil
1,087.68
D-X
273.28
Sinclair
63.88
Western Oil & Fuel
97.45
Texaco
78.94
Cities Service
7.61
Kerr-McGee
5.00
West End Super Service
2.00
Derby Oil
20.26
American Petrofina
20.88
Champlin
4.30
Vickers 6.34
Total
$1,670.90
At trial petitioner also conceded that $208.76 of other a At trial petitioner also conceded that $208.76 of other amounts relating to his automobiles were not deductible leaving the following items totaling $142.27 at issue: 805 Butterworth Tire
$ 30.20
Gideon Sales & Service
8.00
Midtown Motors
17.32
Hayne, Vander Linden, West & Associates, Inc.
37.50
Polk County (License) 49.25
Total
$142.27
*113 Respondent allowed petitioner a deduction of $600 for 1967 for automobile expenses. In 1968 petitioner had $3,421.86 of expenses relating to the operation of his cars of which he deducted $3,124.54 on his return for that year. At trial petitioner conceded that $1,003.21 of amounts paid to oil companies were not deductible leaving the following items totaling $1,701.46 at issue: Standard Oil
$ 970.73
D-X
189.10
Sinclair
256.78
Western Oil
18.25
Texaco
128.45
American Petrofina
34.51
Apco
21.05
Kerr-McGee
12.63
Vickers
11.70
Derby 58.26
Total
$1,701.46 At trial petitioner also conceded that $306.78 of other expenses relating to his automobiles were not deductible leaving the following items totaling $410.41 at issue: Butterworth's
$196.44
West End Service
9.80
George Walker
69.66
Owen Crist
10.00
Auto Re-Nu of Iowa
15.45
Orville Lowe
15.71
Carl Bogenrief
49.25
Hayne, Vander Linden, West & Associates, Inc. 44.10
Total
$410.41 Respondent allowed petitioner a deduction of $600 for automobile expenses for 1968. During the year 1967 petitioner owned three cars consisting of a 1966 Mercury, a Pontiac *114 and a 1966 Cadillac. The Pontiac was traded in on the Cadillac, and consequently petitioners owned two cars at all times during the year 1967. In the year 1968 petitioners continued to own the 1966 Mercury and the 1966 Cadillac. Petitioners also purchased a 1968 Chevrolet Corvette in the year 1968 for their son David. The expenses attributable to David's Corvette were paid in cash and did not appear on petitioner's returns. The Pontiac and the Cadillac were used as the family cars for petitioner's household. Petitioner's wife used these cars to commute to her teaching job and for personal and family errands. Petitioner's children would use the Pontiac or the Cadillac for their own errands. Petitioner's concessions represented the cost of gas and other items for the operation of the Pontiac and Cadillac. The expenses still at issue are attributable to the Mercury. Unless on a specific errand for petitioner no other member of the family drove the Mercury except petitioner. Petitioner used the Mercury to travel among and between his home, the hospitals at which he performed surgery, and his office. Petitioner did not in any way keep track of the miles traveled in transporting himself *115 from one place to another. Petitioner did not have a record of yearly changes in the odometer reading of the Mercury. Petitioner's normal daily routine would consist of going from his home to the hospitals in the morning. He would then go from the hospitals to his office at around two or three o'clock in the afternoon. Petitioner's office closed at 5:00 or 5:30 p.m. After the office closed, petitioner would nearly always go back to the hospitals. Petitioner would leave the hospitals at 6:00 or 6:30 p.m. to go home to eat his evening meal. On the average of four or five nights per week he would go back to the hospitals after his evening meal. Petitioner would drive out of town to see patients once or twice a month. He would drive to such places as Ankeny or Indianola, Iowa. Petitioner did not keep any records of these out-of-town trips. Opinion Petitioner is a surgeon who, during the years in issue, conducted a busy practice in Des Moines, Iowa. In 1965 he purchased a horse at his daughter's suggestion. This horse died in about a month. Later in 1965 petitioner decided to raise and train show horses. During 1967 and 1968, the years in issue, petitioner had an inventory of horses *116 whose original cost was just under $20,000. Through the year 1970 petitioner had total net losses from his horse operations of about $37,000 while his gross income to that time was about $850, consisting of small prizes won at horse shows. In other respects, petitioner's horse enterprise was not a success. Only two of the five horses owned by petitioner during the years in issue were salable show horses, and it is doubtful that petitioner could recoup his initial investment and subsequent losses by selling all of horses. The failure 806 of petitioner's horse operations was due in various parts to his lack of knowledge about horse training, poor judgment, bad luck and lackluster pursuit of profits. Respondent determined that petitioner's losses from his horse operations in 1967 and 1968 were not incurred in the course of a trade or business or in a transaction entered into for profit and were accordingly not deductible. Respondent also disallowed certain automobile and entertainment expenses claimed by petitioner for the years in issue. Horse Expenses We do not need a scalpel to get to the heart of this matter. Respondent contends that petitioner bought some horses for *117 his family's entertainment and recreation and that petitioner's losses are nondeductible personal expenses under section 262. [1] We agree with respondent. Although petitioner testified that he purchased the horses in order to sell them at a substantial profit after training, we do not believe his contention is supported by the record in this case. In view of petitioner's allergies to the subject matter of his purported business and his lack of knowledge in horse training, we would normally find it difficult to understand petitioner's claim that he intended to make money when he purchased his horses; however, petitioner's failure to take necessary positive steps to assure a profit after purchasing the horses leads us to the conclusion that he did not have the required intent. Although the presence of one or more of the following factors would not necessarily rule out the existence of petitioner's profit motive, the presence of all of them leaves little room for argument. (1) Petitioner consulted only his friends and colleagues concerning horse training and did not even follow the advice given. *118 (2) Although thoroughbred horses make the best hunters and jumpers, petitioner had only one thoroughbred during the years in issue. (3) Petitioner raced his only thoroughbred horse, an activity which is normally detrimental to such a horse and inconsistent with hunter and jumper training. (4) Petitioner did not sell his horses. (5) Despite the fact there might be no market for his horses around Des Moines, petitioner did not send his horses to the better shows in various parts of the country to try to sell them. (6) Petitioner did not sell his unsatisfactory horses in order to minimize his losses. (7) Generally, the horses that petitioner owned did not significantly increase in value as a result of the training that they received under petitioner's ownership. (8) Petitioner never improved his knowledge of horse training and trading by attending horse auctions or joining any associations connected with the training and showing of hunters and jumpers. (9) Petitioner did not conduct his horse operations under any business name and did not maintain a separate bank account for them. (10) Petitioner had little concern about his losses from his horse enterprises and was even unaware of the *119 extent of his losses. Of these points, the only one petitioner seriously disputed at trial was that his horses had not increased in value. Petitioner's expert witness, Mr. Davis, testified that petitioner's horses Nymrod and Lyncheer might be worth up to $20,000 and $25,000, respectively. We note first that Mr. Davis, although knowledgeable about hunters and jumpers, was not an expert appraiser of horses but only a horse trainer. He had not yet progressed beyond a lower-rank horse show judge. Mr. Davis' "potential" value theory of appraising horses was also rather curious. According to his estimate, the value of a horse was the best price that might be paid anywhere in the United States to a purchaser who really wanted the horse. However inappropriate his theory might generally be, it could not be realistically applied to petitioner's horses which were never shown outside of the Midwest. Petitioner has cited several memorandum decisions of this Court under which he claims to support his right to deduct his losses; however, all of them contain the objective evidence of an intent to make a profit which is lacking here. See *120 American Properties, Inc., 28 T.C. 1100 (1957). It seems clear to us that petitioner bought the horses as an expensive hobby to please his horse-loving family. His case is factually less persuasive than Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 807 389 U.S. 931 (1967), and Abrams v. United States, 449 F. 2d 662 (C.A. 2, 1971), which hold the losses incurred in horse raising to be nondeductible. Petitioner's intent in purchasing and maintaining his horses is a question of fact. The record in this case as well as our findings of fact amply demonstrate that petitioner's horse losses were personal expenses rather than business losses and that they are not deductible. Gift, Entertainment and Automobile Expenses On his returns for 1967 and 1968 petitioner deducted certain amounts for promotional activity or entertainment. Respondent disallowed these deductions in part as set forth in our findings of fact. The disallowed items are club dues that were paid to various clubs, the cost of some meals taken at these clubs, and in two instances the cost of wedding *121 presents. Petitioner gave these expenses only a perfunctory treatment at trial. His testimony was general and to the effect that he used his clubs to entertain medical colleagues who sent him business; however, he also admitted that the doctors entertained were often his social friends. In his testimony petitioner did not recall the names of any doctor entertained and could not show that any doctor who was entertained actually sent him business. Petitioner introduced no records whatsoever to substantiate his claim for these deductions, nor is there any evidence in the record independent of petitioner's testimony which tends to establish his claim. Petitioner's vague testimony concerning his club dues and meal expenses cannot establish that these items were incurred in the course of his profession for purposes of deduction under section 162. Similarly, petitioner's mere statement that the wedding presents were related to his business because the fathers of the brides sent him business fails to convince us in light of the facts that the doctors involved were also social friends of petitioner and that petitioner often sent wedding presents when he was invited to a wedding. The gift *122 expenses also do not qualify for deduction under section 162. Even if we were disposed to find the expenses to be incurred in the course of petitioner's profession, the absence of any records or other corroborating evidence would bar their deduction under even the most liberal interpretation of section 274. Cf. Norman E. Kennelly, 56 T.C. 936 (1971); and LaForge v. Commissioner, 434 F. 2d 370 (C.A. 2, 1970), reversing 53 T.C. 41 (1969) on this point. After concessions made at trial petitioner contends that he is entitled to deduct as a business expense under section 162 the amounts of $1,813.17 and $2,111.87 for 1967 and 1968, respectively, for the operation of his Mercury automobile. Respondent allowed a deduction of only $600 in each year. We are convinced that only petitioner drove the Mercury, that his driving of the Mercury was related almost exclusively to his professional practice, and that the claimed expenses do not relate to any of petitioner's other cars; however, we must sustain respondent's determination. On a normal day, petitioner would drive first from his house to one of the hospitals at which he had patients, then visit *123 the other hospitals, and arrive at his office in the early afternoon. In the early evening petitioner would leave his office and usually stop back at the hospitals on his way home. Four or five nights a week petitioner would return to the hospitals in the evening after dinner at home. It is clear that petitioner's daily driving routine contained deductible as well as nondeductible driving; however, petitioner has not demonstrated to us what part of his routine represented commuting. In addition, petitioner has admitted that he did a bit of personal driving with his car. Petitioner presented no evidence concerning the distances between the various points in his daily routine. Petitioner kept no records concerning his driving. Consequently, petitioner has provided us with no basis for separating his commuting and personal driving from his deductible business driving. There is nothing in the record indicating that petitioner is entitled to greater deductions for automobile expense than respondent has allowed. In view of the foregoing, Decision will be entered for the respondent. 808 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩